IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| IN THE MATTER OF THE APPLICATION FOR THE SEARCH OF 130 BOXFORD STREET, BASEMENT APARTMENT, LAWRENCE, MA; AND COMPLAINT FOR BLADIMIR ANTONIO SANCHEZ SOTO | Case Nos. 20-MJ-2248-MBB; and 20-MJ-2249-MBB<br><br>**Filed Under Seal** |
|---|---|

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT AND COMPLAINT**

I, Special Agent Adalberto Garcia, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND SPECIAL AGENT BACKGROUND

1. I am currently a Special Agent ("SA"), employed by the Drug Enforcement Administration ("DEA"), and have been so employed in this position since October 11, 2019. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United Stated Code. Prior to my employment with DEA, I was a Police Officer with the Nashua, New Hampshire Police Department for over eleven years. During my career as a Nashua Police Officer, I was assigned to the Nashua Police Department Detective Bureau, to include the Nashua Police Drug Unit. In addition, I was also previously assigned as a deputized DEA Task Force Officer ("TFO") for over two years at the DEA's Manchester, NH District Office ("MDO").

2. As an SA, TFO, and Nashua Police detective, I have conducted and participated in physical and electronic surveillance, written and executed search warrants which have resulted in the seizure of controlled substances and the arrest of narcotics distributors, debriefed informants, and reviewed recorded conversations and narcotics records.

Additionally, I have attended narcotic and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, and the Nashua Police Department.

3. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and local police departments. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation.

**PURPOSE OF AFFIDAVIT**

5. I am submitting this affidavit in support of:

a. An application for the issuance of a search warrant authorizing the search of 130 Boxford Street, Basement Apartment, Lawrence, Massachusetts ("Target Location #3"). A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein. There is probable cause that this premises contains drugs and records and other indicia of drug trafficking because it is controlled by Bladimir Antonio SANCHEZ SOTO and Johnny Wanderley GONZALEZ GRATEROL told investigators that it is used to store illegal drugs.

b.    A criminal complaint charging Bladimir Antonio SANCHEZ SOTO with conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841(a)(1). There is probable cause to believe SANCHEZ SOTO committed this offense because he possessed the Target Cell Phone and he admitted his participation.

## PROBABLE CAUSE

### Background of Investigation

6.    In 2019, law enforcement officials received several drug complaints from store security personnel of at the Marshalls Department store at 90 Pleasant Valley Street, Methuen, MA, who reported that customers complained that people were frequently conducting drug transactions inside the store bathroom.

7.    In response, **on November 13, 2019**, agents of the DEA's Cross Border Initiative Task Force initiated surveillance inside the store and observed a Hispanic male with long hair who was later identified as Johnny Wanderley Gonzalez-Graterol ("J.GONZALEZ-GRATEROL"). A store security officer identified J.GONZALEZ-GRATEROL as one of the individuals who normally goes into the bathroom at the Marshalls to conduct suspected drug transactions.

8.    During surveillance, agents observed J.GONZALEZ-GRATEROL and another person enter the store's bathroom and exit shortly after. The suspected drug buyer left the store while J.GONZALEZ-GRATEROL remained. A short time later, J.GONZALEZ-GRATEROL again proceeded to the bathroom with another person. After a short time in the bathroom, both exited the bathroom at different times. J.GONZALEZ-GRATEROL continued to shop and the other person bought something and exited the store. Agents followed the person, who drove from Methuen, MA to a CVS in Windham, NH, and then drove on to Hudson, NH, where agents arranged a traffic stop. The person admitted that he/she purchased fentanyl inside the Marshalls

bathroom from a drug organization whom he/she knew as the MIKEY DTO by contacting 512-514-3847 ("Target Cell Phone"). In addition, the person's physical description of the seller matched GONZALEZ-GRATEROL. The person initially told agents that he/she only bought 1 gram of fentanyl, however he/she eventually admitted that he/she purchased 12 grams of fentanyl, and had already used one gram while in the CVS bathroom. The person then relinquished to law enforcement the remaining 11 grams of fentanyl, agreed to cooperate in exchange for favorable consideration on whether or not investigators would charge the person with drug offenses in the future, and formally signed up as a North Andover, MA Police Department Confidential Source ("CS"). The CS has a history of drug related arrests with one misdemeanor conviction.

Controlled Drug Purchase on November 14, 2019

9. On **November 14, 2019**, in the presence of law enforcement officers, the CS sent a text message to the Target Cell Phone and inquired if the CS could purchase the same amount as the previous night, referring to the 12 grams the CS purchased at Marshalls on November 13, 2019. The target ultimately agreed to sell the CS 10 grams of fentanyl for $200 and told the CS to meet at the Chic-Fil-A at 73 Pleasant Valley Street, Methuen, MA. Agents then searched the CS for drugs, unexplained currency, or other contraband and gave the CS $200. TFO Michael Lane, acting in an undercover capacity ("UC"), then drove the CS to the location in a UC vehicle. Upon arrival, the CS met GONZALEZ-GRATEROL inside the bathroom and purchased 10 grams of suspected fentanyl. The CS then re-entered the UC vehicle and provided the suspected fentanyl to the UC. After the controlled purchase, the CS sent a text message to the Target Cell Phone inquiring if the CS's friend, referring to the UC, can call the MIKEY DTO. Someone replied yes on the Target Cell Phone.

Undercover Purchase on January 14, 2020

10. On **January 13, 2020**, the UC sent a text message to the Target Cell Phone to arrange for the purchase of fentanyl and or heroin the next day. On January 14, 2020, the UC received the following text message from the Target Cell Phone: "To 48 Sylvester st Lawrence." The UC understood this to mean he was to meet with a member of the MIKEY DTO at the given location and would purchase 15 grams of fentanyl for the $300. The UC drove to 48 Sylvester Street, Lawrence, MA and sent a text message to the Target Cell Phone saying he had arrived. Someone then sent a series of text messages from the Target Cell Phone instructing the UC to leave the area and wait for a text message advising the UC when to return, and that the runner for the MIKEY DTO would arrive via a taxi in 10 minutes. After leaving, the UC received a text message from the Target Cell Phone advising the UC to return to 48 Sylvester Street, Lawrence, MA. When the UC arrived, he approached the garage on the left hand side of the residence and was greeted by GONZALEZ-GRATEROL. Inside the garage, the UC handed $300 to GONZALEZ-GRATEROL in exchange for a clear plastic bag containing numerous clear plastic bags containing an off white powdery substance believed to be fentanyl. The UC then left the area.

First Identification of Johnny Wanderley on January 15, 2020

11. On **January 15, 2020**, investigators established surveillance at 48 Sylvester Street, Lawrence, MA. and observed GONZALEZ-GRATEROL exit the garage, approach a small dark colored sedan with New Hampshire plates, and engage in an apparent hand-to-hand transaction with the male passenger. The vehicle departed and GONZALEZ-GRATEROL remained at 48 Sylvester Street. Later, investigators observed GONZALEZ-GRATEROL exit the garage and travel by taxi to the Los Primos Barbershop in Lawrence. At the direction of

investigators, Lawrence Police Officer Robert Lakein entered Los Primos Barbershop and told GONZALEZ-GRATEROL that he matched the description of a suspect in a theft from a nearby CVS. GONZALEZ-GRATEROL did not provide a license or other official form of identification, but wrote his name as Johnny WANDERLEY, date of birth of January 24, 1995, with an address of 71 Pearl Street Lawrence, MA (Target Location #2).

Undercover Purchase on January 22, 2020

12. On **January 22, 2020**, the UC sent the following text message to the Target Cell Phone: "Coming down now be there around 1130-1200. Need 3 for 600. Can u throw a couple extra in please." Someone immediately responded from the Target Cell Phone with the text message: "Ok." Later, someone sent two text messages from the Target Cell Phone: "Merrimack plaza Methuen," and "McDonald." During subsequent surveillance, investigators observed GONZALEZ-GRATEROL exit **71 Pearl Street**, enter a taxi, and travel to the McDonalds at 170 Haverhill Street, Methuen, MA. GONZALEZ-GRATEROL and a second male exited the cab and entered the McDonalds. GONZALEZ-GRATEROL entered the bathroom and sold the UC 30 grams of suspected fentanyl. The UC then left. A short time later, GONZALEZ-GRATEROL and GARCIA left and were eventually picked up by a taxi, which drove from Methuen to Lawrence. Using a ruse, investigators arranged for a motor vehicle stop during which GONZALEZ-GRATEROL identified himself with a Dominican Republic driver's license as Johnny Wanderley GONZALEZ-GRATEROL, date of birth: 01/24/1995. The second male verbally identified himself as Francisco GARCIA, date of birth: 03/03/2003.

**TARGET LOCATION #1**

13. On **January 30, 2020**, I obtained a warrant to obtain precise location information and use a cell site simulator in connection with the Target Cell Phone. On **January 31, 2020**, investigators began receiving from Sprint "pings" showing the location of the Target Cell Phone. The large majority of pings consistently placed the Target Cell phone in the vicinity of 19 Grove Street, Methuen, MA.

14. On **February 4, 2020**, members of the DEA's Technical Operations Group (TOG) and members of DEA's CBI Task Force Group, deployed a cell site simulator to the area of Union Street and Grove Street in Methuen, MA in accordance with the search warrant for the precision location of the Target Cell Phone. TOG personnel determined the signal was emitting in the general area of 19 Grove Street, Methuen, MA.

15. **On February 5, 2020**, investigators were probably burned on surveillance while attempting to conduct an undercover purchase of fentanyl near Target Location #1. In particular, the UC contacted the Target Cell Phone and ordered a quantity of fentanyl and was directed to 21 Grove Street, Methuen, which is next to Target Location #1. After the UC and surveillance team members arrived, the UC received several text messages from the Target Cell Phone indicating the sender spotted a surveillance car and knew law enforcement was involved. No undercover purchase of fentanyl took place on this day.

16. Later in the day, SA Garcia spoke the CS specifically about Grove Street in Methuen, MA. The CS said approximately a year ago, the CS called the Target Cell Phone to purchase a quantity of fentanyl and was directed to Grove Street in Methuen, MA. Upon arrivals, the CS met with a Hispanic male who exited from a dark Ford Explorer parked at 19 Grove Street. The CS met with this person only once at 19 Grove Street and has not seen him

since. SA Garcia subsequently drove by 19 Grove Street, Methuen, MA and observed a black Ford Explorer bearing MA registration 5FA 479 parked at 19 Grove Street. This vehicle was registered to Estela TORIBIO of 19 Grove Street, Apt.7, Methuen, MA.

17. **On February 19, 2020**, a member of the Technical Operations Group (TOG), along with SA Adalberto Garcia re-deployed the cell site simulator to the area of 19 Grove Street, Methuen, MA in accordance with the warrant. The TOG determined the signal for the Target Cell Phone was emitting in the general area of 19 Grove Street, which is a multi-unit apartment building with a common hallway. TOG personnel and SA Garcia then proceeded to enter the common area of 19 Grove Street to determine the specific location of the cell signature. During a walkthrough on the common hallway with the precision location cell site simulator, TOG personnel determined that the signal for the Target Cell Phone was emitting from 19 Grove Street, Apt. 7, Methuen, MA based on the cell signature.

18. Subpoenaed call detail records for the Target Cell Phone show numerous contacts from October 2019 to January 2020 with phone numbers **978-983-4254 and 617-516-3563**. Both **978-983-4254 and 617-516-3563** are subscribed by Luz TORIBIO. Utility subscriber records obtained from National Grid pursuant to an administrative subpoena show that the subscriber for service at 19 Grove Street Apt. 7, Methuen, MA is Estela TORIBIO, with a primary phone of **978-983-4254**. Estela TORIBIO is also the registered owner of the black Ford Explorer referenced above. Records from the Registry of Motor Vehicles show that Luz and Estela TORIBIO both have Massachusetts' driver's licenses; based on the differences in age reflected in the photographs and dates of birth, I believe Luz and Estela Toribio are mother and daughter.

Execution of Search Warrants and Arrests on February 27, 2020

19.     On the morning of February 27, 2020, investigators executed search warrants at Target Location # 1 and Target Location #2 and arrested GONZALEZ GRATEROL. At Target Location #2, where GONZALEZ GRATEROL was arrested, investigators seized more than 20 one gram bags of suspected fentanyl. Investigators advised GONZALEZ GRATEROL of his Miranda rights and he agreed to speak to them. GONZALEZ GRATEROL told investigators his source of supply was his cousin "Chapito," who lived at 19 Grove Street Apt. 7, Methuen, MA (Target Location #1) and whose wife drove a black Ford Explorer. Based on this information, I believe GONZALEZ GRATEROL was referring to Bladimir Antonio SANCHEZ SOTO. GONZALEZ GRATEROL said he had been working for him for three months and that GONZALEZ GRATEROL sold about 40 grams of fentanyl per day. GONZALEZ GRATEROL also said the cousin had a key for the stash house and that GONZALEZ GRATEROL traveled to the stash house twice per week to obtain additional fentanyl to sell. GONZALEZ GRATEROL told investigators the stash house was a basement apartment at 130 Boxford Street in Lawrence and that the entrance to the apartment was via doors at the back of the property, one of which led directly to the basement apartment and another which led to a first floor hallway which in turn had a doorway which also led to the basement apartment.

20.     Investigators proceeded to 130 Boxford Street and knocked on the door to the basement apartment but there was no answer. They also spoke to the landlord who lives on the second floor. The landlord stated that an older Hispanic male lived in the basement apartment, but that his son-in-law paid the rent about a month ago and said his father-in-law would be in New York. The landlord identified a photograph of Bladimir Antonio SANCHEZ

SOTO as the son-in-law. The landlord stated only the father and son-in-law had access to the basement apartment.

21. At Target Location #1, investigators seized Target Cell Phone #1 and keys to the 130 Boxford Street basement apartment. Present in the premises was SANCHEZ SOTO, Estela Toribio and two young children. Investigators advised SANCHEZ SOTO of his Miranda rights and he agreed to speak to investigators. SANCHEZ SOTO admitted he used the Target Cell Phone to sell fentanyl with his cousin "Johnny Wanderley." He said he obtained 200 grams of fentanyl at a time. Based on information I received from other investigators, I asked SANCHEZ SOTO about 130 Boxford Street. SANCHEZ SOTO denied any connection to 130 Boxford Street, and said used to have a girlfriend who lived at 134 Boxford Street, but that he had not been there in some time. I asked Estela Toribio where were the keys to Boxford, and she pointed to keys in the kitchen, which she said belonged tp SANCHEZ SOTO.

**Drug Traffickers' Use of Residences and Cell Phones Generally**

22. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

a. Controlled substances.

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or

associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

h. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

i. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

23. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug

trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

24. Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts.

25. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

26. Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.

Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

27. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

28. Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

29. During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. It is common for drug traffickers to reside in locations that have utilities subscribed to in the names of friends, relatives, and/or significant others. This is done in an effort to thwart law enforcement detection. Evidence of occupancy,

residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

30. Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in

their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

31. Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

32. Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text

messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment C on their cellular telephones.

33. Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

34. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on

cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a.Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

35. Also from my training and experience, I know that drug dealers often possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the dealers' profits and/or supply of drugs.

36. Based on the foregoing, I believe there is probable cause to believe that SANCHEZ SOTO committed a Target Offense and that evidence of the commission of the

Target Offenses, more specifically, the items set forth in Attachment B will be found at Target Location #3 described in Attachment A.

## CONCLUSION

37. Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Location #3, as described in Attachment A, there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachment B. Accordingly, I respectfully request that a search warrant be issued for the search of the Target Location #3 as described in Attachment A for the items detailed in Attachment B.

38. Further, based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that from November, 2019 continuing until at least on or about January 22, 2020, SANCHEZ SOTO conspired with Johnny Wanderley GONZALEZ GRATEROL to distribute and possess with intent to distribute more than 40 grams of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Accordingly, I respectfully request the issuance of a criminal complaint charging BLADIMIR ANTONIO SANCHEZ SOTO with a violation of 21 U.S.C. §§ 846 and 841(a)(1).

39. Disclosure of the contents of the applications, affidavit, search warrants, and complaint could compromise and jeopardize this ongoing investigation by allowing GONZALEZ GRATEROL and his co-conspirators to flee and/or destroy evidence. For that

reason, I request that the applications, affidavit, search warrants, and complaint be sealed until further order of the Court.

Respectfully submitted,

Adalberto Garcia
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on February 27, 2020.

Marianne B. Bowler, USMJ
The Honorable Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts